IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SHAWN X. HENNY,<br>    Plaintiff, | Civil Action No. 7:08-cv-00399 |
| v. | **MEMORANDUM OPINION** |
| A. P. HARVEY, et al.,<br>    Defendants. | By: Hon. James C. Turk<br>Senior United States District Judge |

Plaintiff Shawn X. Henny, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983, with jurisdiction vested in 28 U.S.C. § 1343, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq, with jurisdiction vested in 28 U.S.C. § 1331. Henny alleges that the defendants, Virginia Department of Corrections ("VDOC") officials, interfered with his right to the free exercise of his religious beliefs as a member of the Nation of Islam ("NOI") while incarcerated at the Wallens Ridge State Prison ("WARSP"). The defendants filed a motion for summary judgment, and Henny responded, making the matter ripe for the court's disposition. After reviewing the record, the court grants the defendants' motion for summary judgment.

I.

A.

Henny alleges that the defendants violated his rights to religious freedom when they failed to separate NOI Friday prayer ("Jumah") service from Sunni Muslims' Friday prayer service, cancelled Jumah services held in the WARSP gymnasium, and served pork-flavored foods to him, a Muslim on a religious diet. Henny names the following defendants in their individual and official capacities: A.P. Harvey, the assistant WARSP warden; B. Watson, the WARSP warden; M. Hensley, the WARSP treatment program supervisor; Dr. Lou Cei, the

VDOC program supervisor; P. Scarberry, the WARSP food service director; Linda B. Shear, the VDOC's chief dietician; and Larry Huffman, a VDOC Regional Director. (Compl. ¶¶ 3-8.) Henny requests a declaratory judgment stating that the defendants violated his constitutional rights; an injunction to prevent the defendants from serving pork-flavored foods to Muslims; $25,000 compensatory, $15,000 punitive, $10,000 speculative, and $5,000 proximate damages from each defendant; and reimbursement of costs and fees. (Compl. ¶ 34.)

## B.

Henny argues in his first claim that defendants Harvey, Watson, Hensley, and Cei violated his rights by not arranging for a separate meeting place for NOI services. Jumah services began meeting in the WARSP gymnasium on October 28, 2005. (Watson Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 2) ¶ 7.) The Jumah service was for both Sunni and NOI Muslims. (Watson Aff. ¶ 7.) Henny arrived at WARSP on December 8, 2006, and began attending the joint Jumah service on December 29, 2006. (Watson Aff. ¶ 7.) On March 21, 2007, Henny submitted an inmate request form requesting a meeting with Watson to discuss NOI services.[1] (Compl. ¶ 12; Harvey Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 3) ¶ 3.) Harvey responded by stating he would meet with Henny at his cell. (Compl. ¶ 12; Harvey Aff. ¶ 3.) Henny and Harvey did not discuss the issue when Harvey walked by Henny's cell during his weekly rounds within the housing units. (Compl. ¶ 12; Harvey Aff. ¶ 4.)

---

[1] Henny also submitted an inmate request form on February 23, 2007, to find out what steps he needed to take to have an NOI program, like a group meeting, outside of the pod. (Hensley Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 4) ¶ 4.) Hensley informed Henny that all religious programs are approved by Cei, the VDOC Special Programs Manager. (Hensley Aff. ¶ 4.) While Cei develops policies and procedures regulating religious programming within the VDOC, Cei does not provide input on establishing a meeting place for NOI services within a specific correctional facility. (Cei Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 5) ¶ 4.) Whether a particular space within a facility is to be set aside for NOI services is left to the discretion of the warden. (Id.)

2

In August 2007, Henny submitted a regular grievance, alleging that he was a member of the NOI, there was only one Jumah service held at WARSP, and that the service was run by the Sunni Muslim community. (Compl. ¶ 14; Ravizee Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 1) ¶ 8, Enclosure B.) The complaint was rejected as untimely because Henny participated in Jumah services with Sunni Muslims for more than thirty days before filing his grievance. (Ravizee Aff. ¶ 9, Encl. B.) Henny submitted a regular grievance on August 17, 2007, alleging that there was no separate group service for the NOI inmates. Henny appealed the denial of his regular grievance as untimely to the Regional Director who affirmed the dismissal. (Ravizee Aff. ¶ 9, Enclosure B.)

On October 12, 2007, the Jumah services were separated by Muslim group although the groups simultaneously met in the same gymnasium. (Watson Aff. ¶ 8.) However, no Imam was willing to come to WARSP to conduct Jumah services for NOI inmates. (Watson Aff. ¶ 18.) Instead, WARSP staff allowed an inmate to conduct Jumah services as an Imam. (Watson Aff. ¶ 18.)

C.

Henny argues in his second claim that defendants Harvey and Watson arbitrarily chose to deprive Henny of all opportunities to attend NOI services. As a result, Harvey experienced chronic depression, anguish, deprivation of sleep, and severe stress. (Compl. ¶ 19.)

On May 9, 2008, Henny filed a grievance stating that the defendants were denying his rights under RLUIPA because he was prohibited from attending NOI Jumah service earlier that day.[2] (Compl. ¶¶ 18, 20; Watson Aff. ¶ 13; Harvey Aff. ¶ 5.) Harvey responded to the

---

[2] Only one Jumah service was cancelled when Henny filed his first grievance. (Watson Aff. ¶ 18.)

3

complaint, stating that WARSP officials were reviewing the cancellation because of security concerns for having large inmate assemblies without an Imam present.[3] (Watson Aff. ¶ 14; Harvey Aff. ¶ 5.) WARSP staff monitor all religious gatherings in the gymnasium because a large group of inmates intermingle in one room. (Watson Aff. ¶ 18.) While monitoring inmate-led Jumah services, Watson and other WARSP staff noticed various behaviors of the inmates attending Jumah. (Watson Aff. ¶ 18.) Several inmates with known gang affiliations would divide into groups according to their affiliation. (Watson Aff. ¶ 18.) Jumah services were subsequently discontinued because any gang activity in a group meeting of that size was a threat to the safety and security of staff and inmates. (Watson Aff. ¶ 18.) Harvey explained in his response to Henny's grievance that WARSP staff observed inmates at Jumah service for unrelated reasons and that Jumah would resume in the near future. (Watson Aff. ¶ 14; Harvey Aff. ¶ 5.) Notably, NOI inmates could still engage in group prayer within the pods. (Watson Aff. ¶ 20.)

Henny appealed Harvey's response to Watson, complaining that WARSP staff violated his religious rights and the disruption of Jumah services severely damaged his ability to practice his religion. (Watson Aff. ¶ 15.) Watson denied his appeal, stating that Jumah services in the gymnasium were postponed due to legitimate security concerns. (Watson Aff. ¶¶ 16-17, Enclosure B; Huffman Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 8) ¶ 8.) Watson cited Operating Procedure ("OP") 841.3, which states: "No offender will be recognized as a spiritual leader" and "Some religious activities may be limited, restricted, discontinued, or denied by the [Warden]

---

[3] Watson avers that no NOI Imam was willing to come to WARSP to conduct NOI Jumah services. (Watson Aff. ¶ 18.)

4

based upon legitimate concerns regarding security, safety, facility order, space, or resources." (Watson Aff. ¶¶ 16-17, Enclosure B at §§ (A)(6)(e), (D)(1).) Henny appealed, and Huffman affirmed Watson's denial of Henny's grievance on June 12, 2008, and determined that OP 841.3 governed the issue. (Huffman Aff. ¶ 9.)

Henny alleges that NOI Jumah services have been cancelled for thirty-three weeks as of December 24, 2008, and argues that the defendants have no intention of resuming NOI services even though no violence ever occurred at an NOI service. (Pl.'s Resp. Mot. Summ. J. (docket #24) 4-5, 6.) NOI Jumah services have not resumed as gang activities that are conducted during these services pose a threat to the safety and security of WARSP inmates and staff. (Watson Aff. ¶ 19.) NOI inmates declined the opportunity to have Jumah services in smaller groups within the pods. (Watson Aff. ¶ 20.) Henny argues that the least restrictive means available to the defendants to secure NOI group services is to ban the individual gang members. (Pl.'s Resp. Mot. Summ. J. 6.)

D.

Henny also claims he was denied a pork-free religious diet. Henny argues that eating pork-flavored foods that do not contain pork products violates his Islamic beliefs because he has a religious right to be free from all pork substances. (Pl.'s Resp. Mot. Summ. J. 7.) He alleges that he suffered dramatic weight loss because he refuses to eat pork-flavored substances. (Compl. ¶¶ 27-28.)

Henny submitted an informal complaint stating that he found out that WARSP staff served pork on the Common Fare menu, violating his religious beliefs. (Compl. ¶ 25; Watson Aff. ¶ 9.) The VDOC offers three primary menus for inmates: a master menu, a medical menu,

5

and the Common Fare menu. (Shear Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 6) ¶ 4.) Foods on the Common Fare menu ("Menu") are designed to meet the religious dietary needs of various recognized religions while providing sufficient nutrition to meet recognized nutritional requirements. (Shear Aff. ¶ 5.) The Menu is eaten by inmates who cannot eat foods from the master menu because of their religious beliefs. (Shear Aff. ¶ 5.) The manufacturer of the foods served on the Menu certifies that the foods are kosher. (Shear Aff. ¶ 5.) The Menu is pork-free, does not include beef or chicken, but tuna is served with dry, reconstituted mixes. (Shear Aff. ¶ 6.)

A staff member denied Henny's complaint, describing the ingredients of the questioned food product, which did not contain any actual pork, pork derivatives, or pork substitutes. (Compl. ¶ 25; Watson Aff. ¶ 10.) The manufacturer's label for the "Vegan Spicy Sausage flavored Rice and Vegetable Dinner with Lentils," the food to which Henny objected, contained: enriched parboiled long grain rice (niacin, reduced iron, thiamin mononitrate, riboflavin, and folic acid), pre-cooked lentils, flavored textured vegetable protein, hydrolyzed vegetable protein (hydrolyzed soy protein, corn syrup solids, carmel color, partially hydrogenated soy oil, disodium inosinate and disodium quanylate), sweet corn, onion, and jalapeno powder. (Compl. ¶ 26; Shear Aff. ¶ 7, Enclosure A 1-3; Scarberry Aff. (Defs.' Br. Supp. Mot. Summ. J. Ex. 7) ¶ 8.) The original label included "pork flavoring" but allegedly had only a "pork" flavor that was created by mixing hydrolyzed corn protein, corn syrup solids, thiamin hydrochloride partially hydrogenated soy oil, disodium inosinate, and disodium guanylate without including any actual pork product. (Compl. ¶¶ 25-26; Shear Aff. ¶ 7; Scarberry Aff. ¶ 8.) The defendants aver that no pork or pork derivatives were in this meal. (Shear Aff. ¶ 7; Scarberry Aff. ¶ 8.) The

manufacturer changed the label by deleting the phrase "pork flavoring" from the list of ingredients and stated that the product did not contain any pork. (Shear Aff. ¶ 7, Enclosure A 1-3; Scarberry Aff. ¶ 8.)

Henny appealed the denial of his complaint, and Watson responded, explaining that the contested food was a kosher, vegan meal and did not contain any pork-related products. (Compl. ¶ 25; Watson Aff. ¶¶ 20-21; Huffman Aff. ¶ 3.) Henny appealed, and Huffman affirmed Watson's response. (Compl. ¶ 29; Watson Aff. ¶ 21; Huffman Aff. ¶ 6.)

## II.

### A.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts and the inferences drawn from those facts in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Federal Rule of Civil Procedure 56(c) mandates entry of summary judgment against a party who "upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240 (4th Cir. 1988). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, no genuine

issue can exist as to any material fact if a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323.

Henny fails to establish any fact that the contested meal contained any pork. Henny only makes a conclusory assertion that he was served a pork product because the label read "pork flavoring" and that eating pork-flavored products that do not contain any actual pork violates his religious belief of avoiding pork products. (Compl. ¶¶ 26-27; Pl.'s Resp. Mot. Summ. J. 8.) Henny recognizes in his complaint that the vegan food label read: "pork _flavor_" made of "hydrolyzed vegetable protein, []hydrolyzed soy protein, corn syrup solids, carmel color, partially hydrognated soy oil, disodium inosinate and disodium quanylate. . . ." (Compl. ¶ 26 (emphasis added)); see 21 CFR §§ 101.4(a)(1), (b)(1)-(2), 101.22(h)(7)(i)(1)(ii) (requiring the disclosure of food flavoring ingredients). Henny cites Hayes v. Long, 72 F.3d 70 (8th Cir. 1995), to support his claim that "Muslim inmates have the right to avoid contact with pork or with any food that has been contaminated by pork" and avers that he is a sincere believer and member of the NOI. (Pl.'s Resp. Mot. Summ. J. 8, 18.) However, Hayes is not persuasive because Henny acknowledges that the product consisted of pork flavoring and was not a food "contaminated by pork."

After viewing the facts in a light favorable to Henny, the court concludes that the defendants never served Henny a food that was contaminated with any pork substance. Henny does not establish that the meal contained any actual pork product or that his personal faith, arising from the NOI, prohibits eating a pork-flavored product that does not contain any pork-related substance. See Celotex, 477 U.S. at 323 (holding no genuine issue of material fact can

8

exist when there is a complete failure of proof for a required element). Accordingly, the court finds that Henny failed to prove an essential element of his claim that the defendants served him an actual pork substance and grants the defendants' motion for summary judgment for this claim.

B.

The defendants argue that they are entitled to qualified immunity. (Defs.' Br. Supp. Mot. Summ. J. 21.) "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lovelace v. Lee, 472 F.3d 174, 196 (4th Cir. 2006) (internal quotation marks omitted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from "bad guesses in gray areas" and ensures that they may be held personally liable only for "transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

The court relies on a two-part test to determine whether the defendants are entitled to qualified immunity. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (holding that the court has discretion to determine the order and extent of a qualified immunity analysis). Under the first part, the court considers whether the facts alleged, taken in the light most favorable to Henny, show that the defendants violated Henny's statutory rights under RLUIPA and his constitutional right under the First Amendment. Lovelace, 472 F.3d at 197.

If the defendants violated a right, the court also considers whether, at the time of the violation, the contours of the right were sufficiently clear that a reasonable official would understand what he is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640

9

(1987); Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007). The inquiry of whether a right is clearly established "must be undertaken in light of the specific context of the case," and "the unlawfulness of the conduct must be manifest under existing authority." Lovelace, 472 F.3d at 198 (internal quotation marks omitted) (quoting Vathekan v. Prince George's County, 154 F.3d 173, 179 (4th Cir. 1998)). Facts warranting qualified immunity are clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state. . . ." Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. Wilson v. Layne, 526 U.S. 603, 614-15 (1999).

1. *RLUIPA claims about having separate NOI Jumah services and suspending NOI Jumah services.*

RLUIPA requires a "more searching standard of review . . . than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." Lovelace, 472 F.3d at 186 (internal quotation marks omitted). Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest[] and is the least restrictive means of furthering that . . . interest." RLUIPA § 3(a), 42 U.S.C. § 2000cc-1(a). Once a plaintiff produces prima facie evidence to support the claim that the challenged practice or law substantially burdens the plaintiff's exercise of religion, the government bears the burden of persuasion on whether the practice or law is the least restrictive

10

means of furthering a compelling governmental interest. Id. § 2000cc-2(b).

To determine whether Henny establishes a prima facie RLUIPA claim, the court must decide whether Henny sincerely held his avowed beliefs and whether they are, in Henny's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "[T]he truth of a belief is not open to question; rather, the question is whether the objector's beliefs are truly held." Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005). Viewing Henny's factual assertions in the light most favorable to him, the court recognizes that Henny has a sincerely-held religious belief that he needs to participate in NOI Jumah service with other NOI inmates.

The next issue is whether the defendants' acts or omissions imposed a substantial burden on Henny's religious exercise. For RLUIPA, the Fourth Circuit determined that a substantial burden "occurs when a state or local government, though act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Lovelace, 472 F.3d at 187 (quoting Thomas v. Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981)). An inmate, however, could decide to be religious about Jumah services and still not be religious about other practices. Id. at 188. An inmate's right to religious exercise would be substantially burdened by a policy "that automatically assumes that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others." Id. (citing 42 U.S.C. § 2000cc-5(7)(A) (providing protection for any exercise of religion); Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir. 1988) (recognizing that a person who does not adhere steadfastly to every tenent of a faith may still be sincere about participating in some religious practices)).

11

> a. Henny does not establish that he was substantially burdened by experiencing Jumah services with Sunni Muslims.

A reasonable jury could not return a verdict for Henny for his first claim. Henny first complains that defendants Hensley, Cei, Harvey, and Watson violated his sincerely-held religious beliefs by not having separate space and Jumah services for NOI muslims apart from Sunni Muslims. However, Henny does not establish in either his complaint or response that he experienced a substantial burden by this practice. Because Henny does not discuss how he experienced any substantial pressure to modify his behavior to violate his beliefs, he fails to present any RLUIPA or First Amendment violation. See Lovelace, 472 F.3d at 199 n.8 (stating RLUIPA incorporates the "substantial burden" test also used in First Amendment inquiries). Accordingly, the court grants the defendants' motion to dismiss for this claim.

> b. Defendants did not substantially burden Henny by suspending NOI Jumah services or did so by the least restrictive means in furtherance of prison security.

The court finds that the defendants' decision to stop holding NOI Jumah services in the gymnasium and permit NOI Jumah services in the pods did not substantially burden Henny's religious right to NOI group prayer when no Imam was willing to travel to WARSP to conduct Jumah services.[4] Henny and other NOI inmates could still practice Jumah service with each other in their respective pods. Although NOI inmates could not pray with every other NOI inmate within the boundaries of the WARSP, NOI inmates were still permitted to meet in groups within the pods to pray together. Henny does not establish a religious right to pray with all the other NOI inmates within a specific distance; instead, Henny wants to pray with other NOI

---

[4] This finding is limited by the relevant facts that no Imam was willing to perform Jumah services at WARSP for NOI inmates and the OP prevents an inmate from leading prayer services.

12

inmates. (Pl.'s Resp. Mot. Summ. J. 5-6.) The policy created by the defendants did not put substantial pressure on Henny to modify his behavior or violate his beliefs because the policy, in the absence of an Imam willing to come to WARSP, still allowed NOI inmates to engage in Jumah services with other NOI inmates. Henny chose to forego group Jumah service in the pods by his own will, and Henny has not alleged that NOI inmates are prevented from having Jumah services in the pods.

Even if the policy substantially burdened Henny his religious exercise, the defendants carried their burden to show that the Jumah services policy is the least restrictive means of furthering a compelling governmental interest. In applying the compelling governmental interest standard, the court gives "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quoting joint statement of Sen. Hatch and Sen. Kennedy, RLUIPA's co-sponsors). If defendants can provide "an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs," that explanation "will be afforded due deference." Lovelace, 472 F.3d at 190.

The defendants explained that no Imam was willing to come the WARSP to conduct Jumah services and VDOC policy prohibits an inmate from serving as a Imam or spiritual leader for religious services. The threat to WARSP security of having an inmate ascend to the status of a religious leader is clear; an inmate-Imam's ability to directly speak to and influence like-minded disciples can pose a direct challenge to the legitimacy and security of WARSP policies and staff. Without an Imam willing to lead Jumah services, the defendants acted accordingly to

13

terminate a large congregation of inmates whose conduct implicated security concerns. The defendants actions are further supported by their observations that inmate gang members were using the service as a meeting place outside their respective pods.

Henny argues that WARSP officials should wait until violence occurs before implementing the new Jumah services policy. This argument is clearly antithetic to WARSP's mission to prevent violence from occurring. The defendants employed the least restrictive means by still permitting NOI inmates Jumah service with each other in their respective pods. Henny's alternative solution of banning inmates who are affiliated with a gang would alternatively burden those inmates' religious rights. Gang members are protected by RLUIPA, too, and the defendants' policy of permitting group Jumah prayer in the pods absent an Imam's presence satisfies Henny's religious rights under RLUIPA while ensuring institutional safety. Accordingly, the court grants the defendants' motion for summary judgment as to this issue.

2. *First Amendment claim about suspending NOI Jumah services.*

The court next considers Henny's remaining constitutional claim that the defendants' decision to suspend Jumah services violated his First Amendment religious right. Claims under the First Amendment require much less scrutiny of prison regulations than RLUIPA requires. Freeman v. Tex. Dep't of Crim. Justice, 369 F.3d 854, 857-58 n.1 (5th Cir. 2004) (cited in Lovelace, 472 F.3d at 199-200).

The Free Exercise Clause of the First Amendment extends to prison inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's constitutional rights must be evaluated within the context of his incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with

14

the increasingly urgent problems of prison administration[,]" Procunier v. Martinez, 416 U.S. 396, 405 (1974) (dictum), and thus, the court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration[,]" Lovelace, 472 F.3d at 199.

This deference is achieved by a rational basis test. The court considers four factors to determine if prison regulations are reasonably related to legitimate penological interests:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace, 472 F.3d at 200 (quoting Turner v. Safley, 482 U.S. 78, 89-92 (1987)). When applying these factors, the court must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

Applying Turner's rational basis factors to Henny's First Amendment claim about Jumah services, the court finds that the defendants' decision to suspend group Jumah services in the gymnasium was reasonable. The policy is rationally related to the WARSP's security concerns because preventing a large group of inmates from all pods who engage in prison gang activities during a religious service where no Imam is present ensures the safety of inmates and staff.

15

Inmates also have other means of exercising various forms of religious exercise, like eating kosher foods served on the Common Fare menu, access to Islamic texts, and Jumah services in the pods. See O'Lone, 482 U.S. 351-52 (holding the relevant inquiry for this factor is whether the inmates have been denied all means of religious expression, not for the particular religious practice allegedly violated). The policy that Henny desires, a weekly congregation of all NOI inmates without any spiritual leader present, would negatively affect the staff's and inmates' personal security because of the open physical access to fellow inmates and the collective force of a large group of inmates in one room. Finally, the new Jumah policy is the easy alternative to an outright ban on NOI Jumah services because NOI inmates are still permitted to pray in groups inside the pods. Accordingly, the court grants the defendants' motion for summary judgment on this issue.[5]

III.

For the foregoing reasons, the court grants the defendants' motion for summary judgment.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the plaintiff and counsel of record for the defendants.

**ENTER**: This 27th day of March, 2009.

/s/ James C. Turk
Senior United States District Judge

---

[5] Because Henny failed to establish a constitutional or statutory claim, the court does not need to continue with any remaining qualified immunity analysis. See Pearson, 129 S. Ct. at 818 (holding that the court has discretion to determine the order and extent of a qualified immunity analysis).